## UNITED STATES DISTRICT COURT
### DISTRICT OF CONNECTICUT

```
-----------------------------X
UNITED STATES OF AMERICA      :
                              :
  v.                          :    CRIM. NO. 3:04CR172(AWT)
                              :
MICHAEL S. CIARCIA            :
-----------------------------X
```

### Ruling on Motions For Judgment of Acquittal and For New Trial

On May 26, 2004, a federal grand jury in Hartford returned a two-count indictment against defendant Michael Ciarcia ("Ciarcia") and his co-defendant, Luis Santiago ("Santiago"), charging them, in Count One, with conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(h), and, in Count Two, with money laundering in violation of 18 U.S.C. § 1956(a)(1)(B)(i). Santiago pled guilty to conspiracy to commit money laundering and was eventually sentenced to 33 months of incarceration, to be served concurrent to a previously ordered federal term of 108 months of incarceration imposed after his April 2002 conviction for conspiracy to distribute 500 grams or more of cocaine. Ciarcia proceeded to trial before a jury, and on April 22, 2005, the jury convicted him on both counts.

The defendant filed a motion for judgment of acquittal and a motion for a new trial. For the reasons set forth below, the court informed the parties on January 3, 2006 that both motions were being denied.

## I.   LEGAL STANDARDS

### A.   Motion for Judgment of Acquittal

It is well established that a defendant who challenges the sufficiency of the evidence to support his conviction after a jury verdict bears a heavy burden.  In reviewing such a challenge, a district court is required to view the evidence, whether direct or circumstantial, in the light most favorable to the government, crediting every inference that could have been drawn in its favor.  See United States v. Maher, 108 F.3d 1513, 1530 (2d Cir. 1997).  "Pieces of evidence must be viewed not in isolation but in conjunction."  United States v. Best, 219 F.3d 192, 200 (2d Cir. 2000), cert. denied, 121 S. Ct. 1733 (2001).  "[T]he government need not have precluded every reasonable hypothesis consistent with innocence.  Finally, a conviction may be based upon circumstantial evidence and inferences based upon the evidence."  United States v. Strauss, 999 F.2d 692, 696 (2d Cir. 1993).

"[T]he jury is exclusively responsible for determining witness' credibility."  Id. (internal citations omitted).  "The trial court must be careful to avoid usurping the role of the jury, and may not substitute its own determination of credibility or relative weight of the evidence for that of the jury."  United States v. Black, 2002 WL 460063, at *1 (S.D.N.Y. March 26, 2002) (citing United States v. Autuori, 212 F.3d 105, 114 (2d Cir.

2

2000)).  "[W]here there are conflicts in the testimony, [the court] defer[s] to the jury's determination of the weight of the evidence and the credibility of the witnesses, and to the jury's choice of competing inferences that can be drawn from the evidence."  Best, 219 F.3d at 200 (internal quotations omitted).

The court "may overturn the conviction only if no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  United States v. Walsh, 194 F.3d 37, 51 (2d Cir. 1999).  "The ultimate question is not whether [the court] believe[s] the evidence adduced at trial established defendant's guilt beyond a reasonable doubt, but whether any rational trier of fact could so find."  United States v. Payton, 159 F.3d 49, 56 (2d Cir. 1998) (emphasis in original).

**B.**   **Motion For a New Trial**

"By its terms, Rule 33 confers broad discretion upon a trial court to set aside a jury verdict and order a new trial to avert a perceived miscarriage of justice.  In exercising the discretion so conferred, the court is entitled to weigh the evidence and in so doing evaluate for itself the credibility of the witnesses."  United States v. Sanchez, 969 F.2d 1409, 1414 (2d Cir. 1992) (internal quotations omitted).  However, "[b]ecause the courts generally must defer to the jury's resolution of conflicting evidence and assessment of witness credibility, '[i]t is only where exceptional circumstances can be demonstrated that the

3

trial judge may intrude upon the jury function of credibility assessment.'" United States v. Ferguson, 246 F.3d 129, 133-34 (2d Cir. 2001) (quoting Sanchez, 969 F.2d at 1414). "The test is whether it would be a manifest injustice to let the guilty verdict stand." Sanchez, 906 F.2d at 1414 (internal quotations omitted).

"A motion for a new trial on the ground of newly discovered evidence is committed to the court's sound discretion. Such relief is merited only if, inter alia, the evidence is such that it would probably lead to an acquittal, and would create a reasonable doubt that did not otherwise exist." United States v. Diaz, 922 F.2d 998, 1006 (2d Cir. 1990) (internal quotations and citations omitted).

"A motion for a new trial based on newly discovered evidence is 'not favored' and a district court 'must exercise great caution . . . and may grant the motion only in the most extraordinary circumstances.'" United States v. Diaz, 176 F.3d 52, 106 (2d Cir. 1999) (quoting United States v. Spencer, 4 F.3d 115, 118 (2d Cir. 1993)). "Such relief should be granted only if the evidence is material to the verdict, could not without due diligence have been discovered before trial and is not cumulative." United States v. Sasso, 59 F.3d 341, 350 (2d Cir. 1995).

4

## II.  DISCUSSION

### A.  <u>Motion for Judgment of Acquittal</u>

A rational trier of fact could have found that the evidence introduced by the government at trial established the defendant's guilt beyond a reasonable doubt on each of Count One and Count Two.  The court instructed the jury that to satisfy its burden of proof with respect to Count One, the government was required to establish, <u>first</u>, that an agreement existed between two or more persons to conduct an unlawful financial transaction, as charged in Count One of the indictment; and <u>second</u>, that the defendant knowingly and willfully entered into that agreement.  The court instructed the jury that to satisfy its burden of proof with respect to Count Two, the government was required to establish, <u>first</u>, that the defendant conducted or attempted to conduct a financial transaction involving property constituting the proceeds of specified unlawful activity, in this case, the distribution of illegal drugs; <u>second</u>, that the defendant knew that the property involved in the financial transaction was the proceeds of some form of unlawful activity; and <u>third</u>, that the defendant knew that the transaction was designed in whole or in part to conceal or disguise the nature, location, source, ownership or control of the proceeds of specified unlawful activity.

At all times relevant to the indictment, the defendant was the owner of Ciarcia Construction LLC, a Connecticut limited liability corporation with place of business in New Britain, Connecticut ("Ciarcia Construction").  During October, November and December 2001, Ciarcia Construction was employed by the New Britain Housing Authority to rehabilitate residential units in the Pinnacle Heights housing development located in New Britain.

The principal focus of the evidence at trial was events that occurred during a five-week period in November and December of 2001, namely, the weeks of November 18, 2001 ("Week 1"), November 25, 2001 ("Week 2"), December 2, 2001 ("Week 3"), December 9, 2001 ("Week 4") and December 16, 2001 ("Week 5").

At trial, the government established that, for the four-week time period from November 18, 2001 through December 15, 2001 (i.e., Weeks 1 through 4), the defendant issued four paychecks to Santiago, each for $448.68, for what purported to be 40 hours of work per week at a pay rate of $15.00 per hour and a before-tax salary of $600.00 per week.  Workers for Ciarcia Construction were paid a week in arrears, so, for example, the paycheck for week ended December 15, 2001 (i.e., Week 4) was issued on Friday, December 21, 2001 (i.e., during Week 5).  The government showed that, at the $600.00 weekly rate, Santiago would have earned approximately $31,200.00 as an annual pre-tax income as an employee for Ciarcia Construction.  The government established

through the testimony of the Ciarcia Construction project manager, Sebastian ("Sebby") Alessandra, that the workers on the project would typically arrive between 8:00 a.m. and 9:00 a.m. and not work past 4:30 p.m.

The evidence showed that the checks for Weeks 1, 2, and 3 were deposited in the bank account of Santiago's mother. However, the check for Week 4 was never cashed. Also, neither party contended that Santiago was paid for, or that there was a claim that Santiago worked, during Week 5.

Santiago's cellular telephone calls were intercepted pursuant to a court-ordered wiretap during the period from Thursday, December 6, 2001 (i.e., during the latter portion of Week 3) through Friday, December 21, 2001 (Week 5). During this period, Santiago made over 1800 telephone calls, hundreds of which occurred during hours when Santiago was supposed to be working for Ciarcia Construction at the end of Week 3 and during Week 4. As to the calls the jury heard from Week 3, there was a suggestion that Santiago was actually showing up for his job with Ciarcia Construction for at least some portion of the day. The jury heard two Thursday, December 6, 2001 conversations between the defendant and Santiago. The first conversation occurred at 2:32 p.m. During that conversation, the defendant referred to Santiago as working for him and stated that Santiago should do certain things unless he wanted to get fired; the defendant also

7

discussed work that Santiago had completed at a location on Dean Drive and gave Santiago instructions to go to a second location:

MC:   Okay Buddy.

LS:   OK...Dean Drive is already done.

MC:   What's that?

LS:   Dean Drive is done so what do you want me to do after that?

MC:   Dean Drive is done?

LS:   Yeah.

MC:   Oh, go to Jerome and Wakefield Court.

LS:   Okay.

MC:   Bye.

(Gov't Ex. 3.)  However, at 2:50 p.m. that same day, there was another conversation between the defendant and Santiago during which the defendant stated, "You gotta understand something and I'm not disrespecting you, my life is totally different than yours . . . ."  (Gov't Ex. 6.)  During this same conversation, when the defendant is making arrangements to talk with Santiago the following day, Santiago told Ciarcia that he would call him after he trained.

The following day, Friday, December 7, 2001, Santiago called Ciarcia at 1:08 p.m. to find out what would be a good time to

stop by and see Ciarcia.  At 2:25 p.m., Ciarcia called Santiago

to follow up on setting up the meeting.  Ciarcia asked Santiago

where he was, and Santiago responded that he just finished with

his boxing training.  Santiago elaborated that he had gone to the

gym for an hour and had then done some boxing for an hour and

that he did his boxing at a friend's house.  At the end of the

conversation, Ciarcia told Santiago to make sure that "you guys"

close up all four of the apartments, and Santiago acknowledged

that he understood the instruction:

    MC:  I know that, but right now my father got your check
         make sure you guys close up all them 4 apartments.  I
         want them all closed up.

    LS:  Okay

    MC:  Okay because over the weekend, I don't want these
         idiots stealing the copper.

    LS:  Okay, I got you.

    MC:  So I'm leaving your check here with my father.  It's on
         top of the his printer

    LS:  Okay

    MC:  Okay

    LS:  Yes sir.

    MC:  So whatever you gotta do cause while he's closing up
         the other ones.

LS:  Okay

MC:  Bye.

(Gov't Ex. 8.)  Thus, the government's evidence showed that on December 6 and December 7, 2001, Santiago at least put in an appearance at some point during the day at the job site, but did not work the hours being reported for him, and that Ciarcia knew Santiago was not working those hours.  The government argued that Santiago's showing up at the job for limited periods of time was merely a subterfuge to make the payments to him appear legitimate.

On the calls that took place during Week 4, Santiago talked of spending hours at the gym and about his schedule in general, which he described as including several hours each day spent boxing, exercising at the gym and sleeping, but he did not include any mention of time spent at work.

On Tuesday, December 11, 2001, Santiago called Ciarcia at 2:29 p.m.  The two of them tried to arrange a time for Ciarcia to call Santiago the following morning.  This led to a statement by Santiago that his practice was to wake up at 8:30 a.m., stay in bed until 9:00 a.m., have his girlfriend get him breakfast by 9:30 a.m., and be at the gym by 10:30.  The conversation ended with Ciarcia stating that he would call Santiago the following day around 10:30 a.m.  (See Gov't Ex. 9.)  Then on Thursday,

10

December 13, 2001, the defendant called Santiago at 9:36 a.m.
They discussed why they were unable to talk on December 12.
Ciarcia stated again to Santiago that "your life is completely
different than mine." (Gov't Ex. 10.)  Santiago later mentioned
that his practice was to go to the gym from 10:30 a.m. until
11:45 a.m.  Ciarcia's response was "Nice schedule.  I am in
misery from when I get up." (Id.)  The conversation closed with
Ciarcia asking whether Santiago was at home, and Santiago
responding in the affirmative.  Later, at 4:29 p.m. on Thursday,
December 13, 2001, Santiago called Ciarcia and when Ciarcia asked
Santiago what he was doing, Santiago's response was that just
then he was doing nothing.  The call ended with the defendant
yelling at Santiago, "Okay, stop busting my balls now.  You got
the world by the . . . hand.  Stay away from me. You don't wanna
come near me, believe me." (Gov't Ex. 11.)

    The government introduced additional circumstantial evidence
that Santiago had rarely reported to work.  Records from two
different gyms used by Santiago during this time showed that,
during hours that Santiago had been supposedly working for
Ciarcia Construction, he had been at the gym.  DEA Task Force
Agent Bruce Boislard testified that, during the many hours he
spent conducting physical surveillance of Santiago in conjunction
with the wiretap investigation, he never once observed Santiago
report to any employment or work at any construction site.  Angel

Gonzalez was not only a drug runner for Santiago, but also his next-door neighbor.  Gonzalez testified that he saw Santiago just about every day during the six months or so prior to December 21, 2001.  Gonzalez testified that although Santiago did talk to him about "buying paychecks", as discussed below, he never talked to Gonzalez about having a job.  Finally, none of the Ciarcia Construction employees who testified were able to discuss Santiago's specific whereabouts during the four weeks he was paid for full-time work by Ciarcia Construction.  Although each employee testified to having seen Santiago at some point during the four-week time period, they all testified that Santiago worked on his own at various construction sites and was largely unsupervised.

The intercepted telephone conversations between the defendant and Santiago during the period from December 6, 2001 through December 21, 2001 also established that the relationship between the defendant and Santiago was more akin to a very close friendship than an employer/employee relationship.  The calls which most vividly illustrated the nature of their relationship were those which came just before and after an incident on December 14, 2001, where Santiago inflicted a minor gunshot wound on an individual known as Pepito; these calls also made it clear that the defendant was aware that Santiago was not at work for Ciarcia Construction on that day.

By way of background, Angel Gonzalez worked at Spano Construction, which was owned by the father of Santiago's ex-wife; Spano is referred to in the intercepted conversations as "Coach."  Gonzalez overheard Pepito, who was one of his co-workers, talking about robbing Santiago by taking something it was believed Santiago was keeping at his mother's house. Gonzalez warned Santiago of the plot to rob him.

At 10:38 a.m. on Friday, December 14, 2001, Ciarcia called Santiago seeking to arrange for delivery of Santiago's paycheck. Santiago stated that he was at Rich's Citgo, which Ciarcia recognized as being "all the way in Berlin."  (Gov't Ex. 13.) Santiago suggested that the person who had the paycheck simply put it in the mailbox at Santiago's mother's house, and Ciarcia responded that that individual was working so Ciarcia would not have him do that.  At 12:53 p.m., Santiago left a message on Ciarcia's voice mail telling Ciarcia "Yo Mike I really need someone to talk to man give me a call as soon as you can.  I really really really need someone to talk to before I go crazy." (Gov't Ex. 14.)  At 12:59 p.m., Ciarcia responded to Santiago's call.  Santiago told Ciarcia that he needed to talk to him about Coach and Santiago.  Santiago mentioned that he was at his grandfather's house and that he was on his way to court. Santiago also discussed with the defendant Santiago's understanding that Coach was behind a plot to have Pepito go to

13

Santiago's mother's house to commit a robbery.  Santiago explained that he had already taken "it out of there" and had "already put it in a safe deposit box," but that he was nonetheless very concerned because "this is my mother's house." (Gov't Ex. 15.)  Ciarcia's response was "why would he do that?" (<u>Id.</u>)  When Santiago stated that he was going to "take 3 licks" at Pepito, Ciarcia's response was "Why would he do that?  I mean why would he do that?  Everything that you do for everybody you know that."  (<u>Id.</u>)  Santiago stated that "right now Pepito is gonna know what . . . I'm all about . . .," and that Santiago was "going over there."  (<u>Id.</u>)  Ciarcia then told Santiago to do what he had to do.  Ciarcia also told Santiago "You're like my brother.  Remember that."  (<u>Id.</u>)  The conversation ended with Ciarcia stating "talk to you after."  (<u>Id.</u>)

Prior to the next conversation between the defendant and Santiago, which took place at 2:31 p.m., there occurred the incident during which Santiago shot Pepito, causing a minor injury to Pepito and, in the process, suffering a flesh wound to his own hand.  At 2:31 p.m., Ciarcia called Santiago.

During the 2:31 p.m. call, Santiago told Ciarcia that "I went to the guy he was going to send and his daughter."  (Gov't Ex. 16.)  Ciarcia inquired whether Santiago had reliable evidence as to the existence of the plot to commit the robbery, and Santiago responded that he did.  Ciarcia's response included a

14

statement that "I told you a long time ago there's only one person you can really trust, but you can put that one next to me. You remember that." (Gov't Ex. 16.)  Santiago and Ciarcia then talked about arranging to meet in person.

At trial, Ciarcia testified that after the 2:31 p.m. call, he and Coach met at Ciarcia's office, and that he and Santiago subsequently met at Santiago's garage on St. Claire Avenue.

At 4:11 p.m. Ciarcia called Santiago, apparently having just met with Coach.  Ciarcia told Santiago that Coach was on his way and Santiago responded that Coach had just called him.  Ciarcia then stated: "Yeah, he called you in front of me.  I told him don't do that cause he knows you're with me."  (Gov't Ex. 17.) Santiago and Ciarcia then discussed how Santiago would get his paycheck and Ciarcia gave Santiago advice on cleaning his wound.

Then, at 6:13 p.m. Ciarcia called Santiago again.  Ciarcia first asked whether Santiago had gotten his message.  Ciarcia then confirmed that Santiago was taking proper care of his wound.

Records submitted to the New Britain Housing Authority by Ciarcia Construction state that Santiago worked a full eight-hour day on December 14, 2001.  Further, Santiago's paycheck for that period reflects that he was paid for a 40-hour work week.

Thus, during the calls on December 14, 2001, Santiago confided in the defendant about the threatened robbery and the

shooting and sought Ciarcia's advice, and the defendant told Santiago that Santiago was like a brother to him and that there was only one person Santiago could trust.  The closeness of the relationship between the defendant and Santiago was confirmed on December 21, 2001, the day of Santiago's arrest, when the defendant told him: "And remember one thing.  Remember one thing. I'm gonna tell you one more time.  Your mother and me probably me are the only two you gotta start trusting."  (Gov't Ex. 25.)

The government also introduced evidence to show that, in 2001, Santiago earned his livelihood as a cocaine dealer who was well-known in New Britain.  The government introduced (1) evidence that a 500-gram package of cocaine was seized from Santiago's residence in December of 2001, (2) evidence as to the facts underlying the wiretap investigation of Santiago during November and December 2001, (3) evidence as to Santiago's guilty plea to a federal cocaine conspiracy charge and the resulting 108-month sentence, (4) the testimony of Gonzalez regarding Santiago's drug dealing activity and regarding the fact that Santiago was a flashy person with jewelry and cars and carried a lot of money on him, and (5) the testimony of Agent Boislard regarding the physical surveillance of Santiago during the course of the wiretap investigation.  In conjunction with this evidence, the government demonstrated that Santiago had almost no work history and reported income in 2001 for only the four weeks he

was reported as working for Ciarcia Construction.  The government also introduced evidence through the testimony of Gonzalez, the submission of various receipts seized from Santiago's residence, the intercepted telephone conversations, and the list of property forfeited by Santiago at the time of his guilty plea in the underlying federal drug case, that Santiago was a financially successful drug dealer who owned, among other things, several motorcycles, expensive diamond jewelry, a Rolex watch, and several cars; the government presented the jury with a list of the forfeited property, which included two different bank accounts, three different cars, a disassembled Harley Davidson motorcycle, four ATV vehicles, and various pieces of jewelry, including a Rolex watch, a diamond ring and a diamond bracelet.

The government also introduced into evidence statements against penal interest made by Santiago.  First, Santiago twice stated to his ex-wife, Denise Santiago, during a conversation on December 15, 2001 that he had paid a company $31,000 to receive paychecks for a year.  (See Gov't Ex. 33.)  On the second occasion Santiago said, "I have a year of paychecks coming in to figure out what to do with my life." (Id.)  Second, Gonzalez testified that about a month before the shooting, when he and Santiago were outside a barbershop, Santiago told Gonzalez that he had paid Michael Ciarcia around $30,000 or $31,000 in exchange for weekly paychecks, and that Santiago was depositing the

17

paychecks into his mother's bank account.  Third, during an intercepted call on December 11, 2001, Santiago stated to an unidentified male that he had made $40,000 in the last year and had paid it up front to a company to receive paychecks.  In response, the defense emphasized the fact that no trace of the $31,000 had ever been found, and the fact Santiago gave different numbers to different people.

As corroboration for its evidence, the government pointed to the fact that Santiago's annualized salary, based on his four weeks of employment, was $31,200, and to evidence showing that three of Santiago's weekly paychecks had, in fact, been deposited into his mother's bank account.  The government also introduced evidence to corroborate other statements made by Santiago during the intercepted calls.  For example, Santiago was overheard discussing appraisals for diamond jewelry and a Rolex watch, items which were specifically listed in the forfeiture order in Santiago's federal drug case.  Appraisal forms for these items, dated December 13, 2001, were discovered in Santiago's residence at the time of his arrest.  In addition, records from two different local gyms showed that, on several occasions, Santiago had been at the gym when he was overheard on the wiretap claiming that he had gone there.

Perhaps the most compelling evidence introduced by the government was a conversation between the defendant and Santiago

18

that took place on December 20, 2001.  It was undisputed by all
witnesses that Santiago had stopped working for the defendant by
that date, and the defendant testified that a decision to
terminate Santiago's employment had been made prior to that date:

> Q.   Now, did there come a time when you discussed the
>      employment status of Mr. Santiago with Mr. Alessandra?
>
> A.   He discussed it with me.
>
> Q.   Okay.  And what did you learn from that meeting?
>
> A.   That he wasn't going to work anymore.
>
> Q.   And whose decision was that?
>
> A.   It was both of ours, but I left it to Sebby because me
>      and Luis were friends and he was dealing with him.  So
>      I left it up to him to, you know, discuss it with him,
>      because he said he would discuss it with him.
>
> Q.   Okay.  Now, the next day, that would have been Friday,
>      December 14th, correct?
>
> A.   Yes.

(Trial Tr. at 502, lines 4-16).  Ciarcia also testified that when
he heard about the shooting, he told Santiago that whether
Santiago wanted to work hard for Ciarcia or not, Santiago could
not work for him because of the shooting:

> Q.   Prior to Mr. Santiago's arrest, did you ever know that
>      Mr. Santiago was dealing drugs?

> A.    No. he never bring that stuff around me.  When I heard
>       about the shooting, I told him it was going to be over
>       anyway, but I told him I don't want nothing to do with
>       stuff like that.  So whether he wanted to work with me
>       or not, after that point he couldn't.
>
> Q.    When you're referring to after that point, you're
>       referring to the shooting?
>
> A.    The guns, the shooting.  I mean, I work hard.

(Trial Tr. at 510, line 20 to 511, line 4).  It is undisputed that Ciarcia heard about the shooting on December 14, 2001, and Ciarcia testified that he met with Santiago on that day.

Nonetheless, during their conversation at 2:55 p.m. on December 20, 2001, the defendant instructed Santiago that he had to come see the defendant once a week to pick up his paycheck:

> LS:   Okay I just wanted to know if should go see ah see you
>       or just get mailed.
>
> MC:   You see me.
>
> LS:   You sure?
>
> MC:   Yeah, you have to see me once a week.
>
> LS:   Okay

(Gov't Ex. 23.)

### B.    **Motion for New Trial**

The defendant has not met his burden of showing that what he characterizes as newly discovered evidence could not with due

20

diligence have been discovered before trial, nor of showing that such evidence was material to the verdict.  The defendant challenges the authenticity of Government's Exhibit 69, which purported to be a receipt found in Santiago's residence at or near the time of his arrest on federal narcotics charges on December 21, 2001.  This exhibit was admitted at trial, by agreement, as a full exhibit.  The defendant now contends the receipt from Galerie Lassen in San Antonio, Texas is a forgery. The defendant proffers a statement made by William Wieland. Wieland reportedly has stated that he had previously been employed by Galerie Lassen, that he had prepared the document himself but could not remember why he had done so, and that he had brought it with him from Texas to Connecticut.  Wieland also reportedly has stated that Santiago purchased a painting from Galerie Lassen in the year 2000 for $4,800.  Government's Exhibit 69 refers to the purchase price of the artwork as $17,500.

As an initial matter, the court views it as significant that the defendant stipulated to the admission of this exhibit.  It is unclear how a defendant can satisfy the due diligence requirement under Rule 33 where the defendant has explicitly agreed to the admissibility of an exhibit and later second guesses that decision and argues that he did not have sufficient information at the time to make an informed decision.  In addition, the defendant had an opportunity at the time of trial to learn the

information he now characterizes as newly discovered.  Both the
government and the defendant subpoenaed Wieland to testify at
trial, and Wieland appeared at the courthouse prepared to
testify.  In the end, neither party called him as a witness.
However, prior to trial and throughout the course of the trial,
the defendant had ample opportunity to interview Wieland, discuss
his prior employment history and learn the information that the
defense first learned after the trial.

As to materiality, the defendant contends that the receipt
from Galerie Lassen was an important piece of evidence that was
critical to the government's case.  However, the record reflects
that it was not.  The government offered the receipt from Galerie
Lassen through Agent Bosilard.  Although the agent was able to
identify the other documents taken from Santiago's residence at
the time of his arrest, he was unable to identify Government's
Exhibit 69.  He simply testified that it was "a piece of paper"
that came from Santiago's apartment.  (Trial Tr. at 156-59.)
When he was asked what the paper was, the agent testified that he
really did not know, and the government did not question him
further about it.  See id.  On the other hand, the defendant
asked both Agent Bosilard and IRS Special Agent Michael Laskowski
a number of questions about the receipt.  (See Trial Tr. at 161-
62 and 360-61.)

During its closing argument, the government did not mention the receipt from Galerie Lassen at all.  When it discussed the fact that Santiago had significant assets, it relied upon other exhibits but not Government's Exhibit 69.  (See Trial Tr. at 575.)

Accordingly, the receipt from Galerie Lassen was not important or critical to the government's case, and the court concludes that the requirement of materiality to the verdict is not satisfied here.

## III.  CONCLUSION

For the reasons set forth above, each of the defendant's Motion for Judgment of Acquittal (Doc. No. 113) and Motion for New Trial (Doc. Nos. 115, 131, and 133) are DENIED.

It is so ordered.

Dated this 28th day of June 2006, at Hartford, Connecticut.


                              /s/ (AWT)
                         Alvin W. Thompson
                    United States District Judge